**Opinion issued February 19, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-25-00702-CV**

———————————

**IN THE INTEREST OF M.H., A CHILD**

———————————

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-00244J**

———————————

**MEMORANDUM OPINION**

This accelerated appeal arises from a suit brought by the Texas Department of Family and Protective Services (DFPS) to terminate a parent-child relationship.

After a bench trial, the trial court terminated Mother's parental rights to her minor child, "Max."[1] The trial court's decree of termination is based on its findings

---

[1] Pursuant to the Texas Rules of Appellate Procedure, we use an alias to refer to the child, M.H., and to his parent, also initialed M.H. *See* TEX. R. APP. P. 9.8(b)(2)

under subsections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code and that termination of the parent-child relationship is in Max's best interest. Mother now argues that there is insufficient evidence to support the trial court's decision to terminate her parental rights and to appoint DFPS as Max's managing conservator.

We affirm.

## Background

Max was born in September 2023. At the time, Mother had six other children in the care of DFPS, based on alleged physical and sexual abuse in the home. Two months later, DFPS received a report that Mother was neglecting Max. The children's father, C.J. (Father), was incarcerated, and Mother was unemployed and living with a friend. Mother refused to provide DFPS with Max's location. After an investigator conducted an extensive search, Mother agreed to meet with DFPS in a Walmart parking lot but continued to deny DFPS access to assess Max's living conditions. Mother tested positive for cocaine in December 2023 and again in early January 2024.

Later in January 2024, DFPS filed a suit for the emergency protection of Max and for termination of Mother's parental rights. The trial court issued an emergency

(providing that, in parental-rights termination cases, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").

2

order for Max's protection and appointed DFPS as Max's emergency managing conservator. And Max was placed into foster care.

Two months later, Mother was arrested for the offense of indecency with a child.[2] And her parental rights to her other six children were terminated shortly after. Mother was released from jail in April 2025—when Max was 18 months old.

DFPS Caseworker Destiny Williams testified that, while Mother was incarcerated, she completed a parenting class, wrote Max a letter, and requested updates on him. But, after her release, Mother did not begin any of the services in her DFPS family service plan to regain access to Max.

And Williams has since been unable to verify whether Mother has a safe and stable environment for Max. Mother has remained unemployed and is living with her mother. She planned to move with Max to a shelter or move in with her boyfriend. But Mother's boyfriend was also recently incarcerated for the offense of indecency with a child. And, according to Williams, Mother did not recognize any concern for Max's safety in that regard. On June 25, 2025, Mother again tested positive for cocaine and for marijuana.

Williams further testified that Max is thriving in foster care. His foster family has formed a strong relationship with Max's relatives, and Max visits his siblings

---

[2] The alleged offense, which involved Mother's other children, occurred in December 2022—prior to Max's birth. The charge was apparently dismissed in May 2025.

monthly. He has completed physical therapy for his initial difficulty with walking and is receiving speech-development services. Williams noted that the foster family wishes to adopt Max.

Guardian ad litem Jennifer Brashear testified that she visited Max in foster care monthly. Max was walking, improving his speech, and meeting his milestones. Brashear noted that she had "not seen any progress" from Mother. Brashear opined that Mother's continued drug use and inability to obtain employment or housing all contributed to an unsafe environment for Max.

Finally, DFPS presented evidence of Mother's criminal history from 2009 to 2022—which includes eight offenses of theft, burglary, assault, and making terroristic threats.

Mother testified that she wrote three letters to Max while she was incarcerated and asked to see him, but her request was denied. After her release, she had an appointment to begin her DFPS family services but did not go because "[i]t slipped [her] mind." And, by the time of trial, she still had not "officially" started her services. Mother admitted that she tested positive for cocaine both before and after her incarceration—but she denied that she had ever used cocaine.

According to Mother, if Max were returned to her, she planned to live with him at a shelter or with her mother. But Mother admitted having previously refused to abide by the rules and curfews at shelters, and she acknowledged that her mother

also has "CPS history." She was still in a relationship with her boyfriend, but denied that she planned to live with him. And Mother planned to rely on her mother for money to care for Max.

In its decree, the trial court terminated Mother's parental rights to Max after finding that Mother engaged in the predicate acts set forth in subsections 161.001(b)(1)(D), (E), and (O) of the Family Code and finding that termination of her parental rights is in Max's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (b)(2).[3]

**Termination of Mother's Parental Rights**

Mother now argues on appeal that the evidence is legally and factually insufficient to support the trial court's findings.

**A.     Standard of Review**

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is,

---

[3]     The trial court also terminated Father's parental rights to Max. Father is not a party to this appeal.

therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute[,] protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit her parental rights based on her actions or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (internal quotations omitted). "[W]e look at all the evidence

6

in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). And we "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.W.*, 645 S.W.3d at 741 (internal quotations omitted). In a bench trial, it is within the province of the trial court to weigh the evidence and resolve conflicts and inconsistencies. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**B.      Applicable Law**

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022) (citing TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2)).

Generally, only one predicate ground and a best-interest finding are necessary for termination, "so a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *Id.* (internal quotations omitted).

Although only one predicate ground is necessary to support a termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of h[er] rights to *another* child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M). "[B]ecause prior termination for endangerment is a predicate ground for a future termination, due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting

8

a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704.

Because Mother challenges the trial court's findings under subsections (D) and (E), we must address those findings first. *See id.*

## C. Endangerment Findings

### 1. Section 161.001(b)(1)(D)

Section 161.001(b)(1)(D) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D).

To establish subsection (D), DFPS must prove that the parent's conduct caused a child to be placed or remain in an "endangering environment." *In re J.W.*, 645 S.W.3d at 749; *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The suitability of the child's living conditions and the conduct of parents or others in the home are relevant to this inquiry. *See In re J.W.*, 645 S.W.3d at 749. "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan*, 325 S.W.3d at 721. "A parent's illegal drug use . . . may

also support a finding that the child's surroundings endanger his or her physical or emotional wellbeing." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied).

Under subsection (D), termination may be based on a single act or omission. *Jordan*, 325 S.W.3d at 721. And the relevant time frame for evaluating endangerment under subsection (D) is prior to the child's removal. *In re J.W.*, 645 S.W.3d at 749 & n.12.

Here, according to the testimony and evidence admitted at trial, Max was born in September 2023, and DFPS removed him from Mother's care four months later—on January 30, 2024. *See id.* During that interim, Mother, who was Max's primary caregiver, tested positive for cocaine in December 2023 and again in January 2024. And Mother had no income and claimed to be living with a friend—although she gave DFPS an incorrect address and refused to provide Max's actual location.

Thus, Mother's felony-level drug use had a close temporal proximity to her unemployment and lack of a stable home. *See In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024). And the trial court could reasonably infer that her difficulties in providing for Max were related to her drug use. *See id.* ("Father's continued lack of housing and ability to support his children exemplify risks that a pattern of drug use can create."). When a pattern of drug use is coupled with evidence of attendant risks

10

to employment and housing, a factfinder can reasonably find endangerment to the child's physical or emotional well-being under subsection (D). *See id*. at 278–81.

Mother testified that Max was healthy when he was born and met all of his milestones while in her care. And she claimed that she took him to all of his doctor's visits. She argues on appeal that this "directly counters any evidence that [she] allowed [Max] to remain in dangerous conditions."

But "[i]t is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re R.J.*, 579 S.W.3d at 117 (internal quotations omitted). Thus, the trial court was free to disbelieve Mother and to determine the weight to afford her testimony.

Viewing all the evidence in a light most favorable to the trial court's finding, and considering undisputed contrary evidence, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Max to remain in conditions or surroundings that endangered his physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.W.*, 645 S.W.3d at 741.

Furthermore, considering the entire record, including evidence both supporting and contradicting the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mother knowingly placed or

11

knowingly allowed Max to remain in conditions or surroundings that endangered his physical or emotional well-being. *See In re C.H.*, 89 S.W.3d at 25–26.

We therefore hold that the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsection (D). *See* TEX. FAM. CODE § 161.001(b)(1)(D).

## 2. Section 161.001(b)(1)(E)

Section 161.001(b)(1)(E) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if his environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

12

For instance, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Abusive and violent criminal conduct by a parent can also produce an environment that endangers a child's well-being and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *Jordan*, 325 S.W.3d at 724; *Walker*, 312 S.W.3d at 617. And "[e]vidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under [sub]section E has been established." *Jordan*, 325 S.W.3d at 724.

Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, . . . incarceration does support an endangerment finding if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) (internal quotations omitted). Thus, "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313.

Additionally, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. On this point, our supreme court has explained that endangerment does not require a parent's drug use to directly or physically harm the child. *See In re R.R.A.*, 687 S.W.3d at 278. "Instead, a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *Id.*

"A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* Thus, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission . . . ." *Id.* at 831. A parent's conduct prior to the child's birth and either before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring before the child's birth can be considered as part of a

14

voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.* And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

To support termination under subsection (E), it is not necessary to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

Here, DFPS presented evidence that Mother has a history of criminal activity and of abusive and violent conduct. This includes eight offenses from 2009 to 2022 of theft, burglary, assault, and making terroristic threats. Further, in December 2022, one of Max's older siblings reported that Mother had shown him pornographic videos, that Mother and Father had required him to remove his clothing and pose for photographs, and that Mother and Father had engaged in sexual conduct in front of their children. And in March 2024, when Max was six months old and in DFPS care, Mother was charged with the offense of indecency with a child and arrested. And Mother remained in jail for over a year.

Intentional criminal activity that exposes a parent to incarceration endangers the physical and emotional well-being of a child. *Boyd*, 727 S.W.2d at 533 ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue

15

of endangerment."). And evidence that Mother has engaged in abusive and violent criminal conduct toward her children in the past permits an inference that she will continue such conduct in the future. *See Jordan*, 325 S.W.3d at 724; *Walker*, 312 S.W.3d at 617 ("Evidence as to how a parent has treated another child . . . is relevant regarding whether a course of conduct under [subsection (E)] has been established.").

That Mother's conduct occurred before Max's birth, that none of her conduct involved physical injury to Max, and that some of her conduct did not result in a final conviction did not prohibit the trial court from considering those facts as evidence of endangerment. *See Jordan*, 325 S.W.3d at 724; *Walker*, 312 S.W.3d at 617; *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[E]vidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection (E).").[4]

Further, as discussed above, DFPS presented evidence that Mother's substance abuse has affected her ability to parent. *See In re R.R.A.*, 687 S.W.3d at 278–79; *In re N.J.H.*, 575 S.W.3d at 831–32 ("Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires

---

[4] *See, e.g.*, *In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Although the charges stemming from these two arrests were ultimately dismissed, each time the mother was jailed, she was absent from [the child's] life and was not able to provide for [the child's] physical and emotional needs.").

outside the child's presence."). Mother tested positive for cocaine when Max was three months old and again when he was four months old. And Mother has remained unemployed and without a stable home. Her use of illegal drugs also constitutes endangering conduct because "it exposes [Max] to the possibility that [Mother] may be impaired or imprisoned." *See Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*, 283 S.W.3d at 345. And Mother continued to use cocaine during the pendency of these proceedings, despite having lost her parental rights to her six other children and knowing that her parental rights to Max were subject to termination. *See In re J.O.A.*, 283 S.W.3d at 346 (listing parent's use of marijuana "shortly before the final hearing" as evidence in favor of termination); *In re N.J.H.*, 575 S.W.3d at 831–32.

Mother denied at trial that she used cocaine. But she admitted that she tested positive both before and after she was incarcerated. The trial court, as the sole arbiter of credibility and demeanor, could have weighed the conflicting evidence and chosen to disbelieve Mother's testimony that she did not use cocaine. *See In re J.W.*, 645 S.W.3d at 741; *In re R.J.*, 579 S.W.3d at 117 (trial court was free to disbelieve parent's testimony minimizing alcohol consumption).

Mother argues on appeal that her testimony that she "wrote [Max] three letters, checked in on him frequently, requested photos of him, and requested to have visits with him" "showcases [her] bond with [Max] and counters evidence of endangerment."

17

"[A] parent's efforts to improve or enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment under [s]ubsection E." *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *10 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.). Nonetheless, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346.

Here, the trial court could have inferred from the evidence that Mother has engaged in a pattern of conduct that put Max in danger, or that she would engage in conduct in the future that would endanger Max. Thus, considering the evidence in the light most favorable to the trial court's finding under Section 161.001(b)(1)(E), we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mother endangered Max's physical or mental well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.W.*, 645 S.W.3d at 741.

We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of a finding of endangerment under Section 161.001(b)(1)(E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction regarding Mother's endangerment of Max. *See In re C.H.*, 89 S.W.3d at 25–26.

Accordingly, we hold that legally and factually sufficient evidence supports the trial court's findings under Section 161.001(b)(1)(E).[5] *See* TEX. FAM. CODE § 161.001(b)(1)(E).

## D. Best Interest of the Child

Mother also asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in Max's best interest.

### 1. Applicable Law

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several non-exclusive factors, the "*Holley* factors," including: (1) the child's desires; (2) the child's emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that

---

[5] Because the evidence support's termination of Mother's parental rights under subsections 161.001(b)(1)(D) and (E), we do not separately address Mother's challenge to the trial court's other predicate ground for termination. *See In re N.G.*, 577 S.W.3d 230, 237 & n.1 (Tex. 2019); TEX. R. APP. P. 47.1.

the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.*; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29.

It is not necessary that DFPS prove all of these factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. Accordingly, the absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in a child's best interest. *Id.*

### 2. Analysis

Based on the above standards, several factors support the trial court's finding that termination of Mother's parental rights is in Max's best interest.

First, at the time of trial, Max was not yet two years old. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The evidence at trial demonstrated that Max spent minimal time with Mother. As discussed above, Max was removed from Mother's care by emergency order for his protection when he was just four months old, and he was placed with his foster

family.  Two months later, Mother was arrested for indecency with a child and spent over a year in jail.  After her release, she did not begin any of the services required to regain access to Max, and she continued to test positive for drug use.  Consequently, she was not allowed to visit Max.  At trial, she had still not initiated her services or visited Max. *See In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("Parental absence or lack of involvement is especially telling with respect to the best interest of very young children, like babies and toddlers, due to their inherent vulnerability and particular need for parental attention and nurturing.").

The trial court also heard testimony that Max is thriving with his foster family. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming that termination was in child's best interest when child was thriving in foster care).  DFPS introduced evidence that Max's foster home is safe and provides for all of his needs.  Max has received physical therapy to address walking issues and is in speech therapy.  And he is meeting all of his milestones.  At the time of trial, Max was 22 months old and had spent 80 percent of his life with his foster family.  And the testimony shows that his foster family wants to adopt him. This evidence supports the trial court's best interest finding under the first, second, and seventh *Holley* factors. *See In re J.D.*, 436 S.W.3d at 118 (considering, in assessing

21

child's physical and emotional needs, evidence that child had been in foster home for most of her life, foster family provided safe and stable home and planned to adopt her as evidence supporting trial court's best interest finding); *Holley*, 544 S.W.2d at 372 (factors one, two, and seven).

Next, as detailed above, the evidence shows that Mother has a history of substance abuse, which continued during the pendency of this case. Max was removed from Mother's care after she tested positive for cocaine. "A factfinder may afford great weight to the significant factor of drug-related conduct." *In re N.J.H.*, 575 S.W.3d at 834. A parent's drug use is a condition indicative of instability in the home environment because it exposes a child to the possibility that the parent may be impaired or imprisoned. *Walker*, 312 S.W.3d at 617. Here, evidence of Mother's drug use, coupled with the evidence that Mother failed a drug test during the pendency of this case—while she was aware that her parental rights to Max were at issue—supports an inference that Mother is at risk for continuing substance abuse. *See In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *10 (Tex. App.— Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.); *In re R.J.*, 579 S.W.3d at 118 (trial court may measure parent's future conduct by past conduct).

And the evidence of Mother's pattern of drug use "is relevant, not only to h[er] parenting abilities and to the stability of the home [s]he would provide, but also to the emotional and physical needs of [Max], now and in the future, and to the

emotional and physical danger in which [Max] could be placed, now and in the future." *See In re N.J.H.*, 575 S.W.3d at 834; *see also* TEX. FAM. CODE § 263.307(b)(8) ("whether there is a history of substance abuse by the child's family or others who have access to the child's home"); *In re C.H.*, 89 S.W.3d at 28 (holding that same evidence may be probative of both section 161.001(b)(1) and best-interest grounds); *Holley*, 544 S.W.2d at 372 (factors two, three, four, and seven).

Additionally, as detailed above, the trial court heard evidence of Mother's history of engaging in criminal and assaultive or abusive conduct—including against her other children. A parent's abusive or endangering conduct may be considered in a best-interest analysis even when it occurred before the child's birth or was not directed at the child. *See In re G.M.G.*, 444 S.W.3d 46, 59 (Tex. App.—Houston [14th Dist.] 2014, no pet.). This evidence supports the trial court's best-interest finding under the third *Holley* factor. *See Holley*, 544 S.W.2d at 372; *see also* TEX. FAM. CODE § 263.307(b)(7) ("whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home"), (b)(12)(E) ("protection from repeated exposure to violence even though the violence may not be directed at the child").

Finally, with respect to the stability of Mother's home and her plans for Max, the trial court heard evidence that Mother is without any means of supporting Max and that she lacks stable housing. *See In re K.W*., 2024 WL 116938, at *7. There

23

was testimony that she planned to live with Max at a boyfriend's house, which Mother denied. But Mother admitted that she is still in a relationship with the boyfriend and that he was recently incarcerated for indecency with a child. And she claimed to have no concerns for Max's safety in that regard. Mother testified that she planned to stay with her mother, but acknowledged that her mother also has CPS history and cannot be approved by DFPS as a caregiver. Mother also stated that she planned to take Max to a shelter. But she admitted that she will not stay at a shelter because she does not want to follow the rules and curfews. Further, Mother admitted that she failed to complete her family service plan. *See id.* (failure to complete family service plan demonstrates inability to provide child with safe environment). This evidence supports the trial court's best-interest finding under the third, sixth, and seventh *Holley* factors. *See Holley*, 544 S.W.2d at 372.

The evidence weighing against a finding that termination is in Max's best interest is limited—Mother testified that she provided for Max during his first four months, wrote letters to Max while she was incarcerated and asked for photographs of him, and she completed a parenting class. But even considering that evidence, we conclude that, on balance, the evidence demonstrates that the applicable statutory and *Holley* factors weigh in favor of the trial court's best-interest finding.

Accordingly, considering the evidence in the light most favorable to the trial court's best-interest finding, we conclude that a reasonable trier of fact could have

24

formed a firm belief or conviction that termination of Mother's parental rights was in Max's best interest. *See In re J.W.*, 645 S.W.3d at 741.

We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in Max's best interest. *See In re C.H.*, 89 S.W.3d at 25–26. We therefore hold that legally and factually sufficient evidence supports the trial court's best-interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

### Appointment of DFPS as Managing Conservator

Mother further argues that the trial court erred in appointing DFPS as Max's sole managing conservator.

We generally review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). However, the Family Code requires a trial court that terminates the parent-child relationship with respect to both parents, as here, to "appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.). Thus, "[a] trial court does not abuse its discretion in appointing [DFPS] as conservator of the child[]

where the evidence is sufficient to support termination of parental rights." *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Rather, "[o]nce we overrule a parent's challenge to the termination order, the trial court's appointment of [DFPS] as sole managing conservator may be considered a 'consequence of the termination.'" *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.).

As discussed herein, the evidence is sufficient to support the trial court's decree terminating Mother's parental rights—which divested her of her legal rights and duties to Max. *See* TEX. FAM. CODE § 161.206(b). A parent with no legal rights with respect to her child lacks standing to challenge the portion of the trial court's order appointing DFPS as the sole managing conservator. *In re A.L.J.*, 2019 WL 4615826, at *9.

Accordingly, we hold that Mother lacks standing to challenge the portion of the trial court's decree appointing DFPS as sole managing conservator of Max. *See id.* ("Mother does not have standing to challenge the portion of the order appointing [DFPS] as permanent managing conservator of the children because any alleged error could not injuriously affect her rights.").

## Conclusion

We affirm the trial court's decree of termination.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.